The next matter on our calendar is, um, um, Hector, United States of America v. Hector Santillan. You may proceed. Good morning, Your Honors. Michelle Barth on behalf of Mr. Santillan, who is the appellant in this matter. This case involved a traffic stop of a car in which Mr. Santillan was traveling. So the central question before this court is whether the prolonging of the stop to investigate other criminal activities was warranted by reasonable suspicion. Officer Marrera testified that eight minutes into the traffic stop. He had all of the information he needed in order to issue tickets, but he found nothing suspicious in the driver's licenses or the registration of the car. That's correct. He found nothing suspicious about it. Per Rodriguez, absent reasonable suspicion of some other crime. That eight minute mark is the equivalent of a fourth amendment terminus. Now there are two facts that the government has relied on that happened within that eight minute period. The first factor is the ubiquitous signs of nervousness. And the second factor is the alleged inconsistent responses between Rivera and Santillan about their travel plans. Regarding nervousness, this is a law enforcement go to. Well, leave that alone. I mean, because that can be, I think, used in conjunction with something else. But the evasive answers, that's a different story, the inconsistent answers. It seems to me that that might merit further inquiry. They didn't know where they were, they couldn't say where they'd been, they couldn't give the address, they couldn't remember names, all of that. Why isn't that enough? Well, I- At least for a little more investigation. I think there are two important points that I'd like to make about the alleged inconsistent statements. First, the statements in and of themselves were not inconsistent. That was Officer Morera's conclusory- Why don't we leave the word, switch the word inconsistent out and put questionable, questionable statements, curious statements, statements that would raise questions in the part of the officer. I think what we're left with is that Rivera did not know Santillan's aunt's home address. Both men said- What about Santillan knowing his aunt's home address? He was- And the name of his aunt. So I don't think that the name of his aunt happened during that initial questioning. Both men said they came from Santillan's aunt's home. So they confirmed one another on that point, that Rivera didn't know the exact address of Santillan's aunt's home is of no moment. And Mr. Santillan told the officer she lives in Jersey and gave the name of a city. So in the end, those factors, even coupled with nervousness, does not amount to reasonable suspicion, especially when you consider all the other factors that were before the court. There was no testimony that the men were traveling along a drug corridor, that they were traveling from a source city, that they were traveling at a suspicious time of day. I have a question about the cell phones in the car. How many cell phones were there? There were multiple cell phones, I believe two. And where were they? In the center console, I believe, Your Honor. But that would have been discovered after Mr. Santillan or Rivera was asked to leave the car. That's exactly right, Your Honor. And I think that's a really important distinction because one of the problems with the- I'm sorry, they weren't visible prior to that? They may have been visible, but the officer only discovered it after Santillan left the car. So I think that part of the problem with the district court's decision here is that it mixed up all of the reasonable suspicion factors in its decision. It issued a pre-Rodriguez decision and then issued a post-Rodriguez decision, and both opinions relied on factors that occurred after the eight-minute mark without distinction. And both opinions relied on cases that were abrogated by Rodriguez. So in the end, what you have are- Did Santillan have a valid driver's license? No, he had a photocopy of his ID. Mr. Santillan was a passenger in this car. Right, I understand that. What was his ID? Do you know what the document was? Was it a driver's license or- I don't recall. I thought it was a driver's license. Maybe I'm wrong on that. It was a photocopy of his ID. Photocopy of an ID. They checked it in their in-car computer, didn't they? I'm sorry? They checked the driver's license in their in-car computer. That's correct. And when they did that, Your Honor, it turns out that Mr. Rivera was a registered owner of the car. They both had valid identifications. They both had no outstanding warrants. The Passat was registered. And then you add in that there was no observable contraband. You didn't smell drugs. The men accurately identified themselves. And the men were headed north towards Massachusetts, which is where they said that they were headed. So the sorts of factors which would justify extending a traffic stop just aren't present here. It really comes down to the inadequate answers, as the officer saw it, to the questions. They're a little like people in a Beckett play. They don't know where they've been, and they don't know where they're going. That's really the core of the basis for the investigative stop, right? Well, I guess whether or not you can ask about travel plans at all during a traffic stop, I think is an open question. I think Rodriguez limits it to anything that extends the stop without reasonable suspicion violates Rodriguez. And this court has an issue- Are you saying that the officers who lawfully stop a person for traffic violations are not able to ask where they're going, what they're planning to do, that kind of thing? I think it depends on the circumstances. There certainly is no- I'll have to remind the policemen that pulled me over that they have to stop there. Maybe it sounds a little silly, but what Rodriguez says is that an officer cannot extend a stop without reasonable suspicion. And this court hasn't published a case on the issue, but there is an unpublished case, U.S. v. Carter, which suggests that asking about travel plans is not per se permissible. In fact, the court in Carter found that it was permissible under those circumstances because the officer suspected that the driver was impaired and because of a homemade sign that was on the outside of a taxi cab door. And in that case, the officer's questions about travel plans were related to the stop. You can't say that about this case, however, because there was no reason to ask about their travel plans. The act of asking about the travel plans prolonged the stop, and the officer cannot prolong the stop so that he can develop the requisite amount of suspicion. The suspicion must arise before the extension. I thought if a person is walking down the street and a police wants to, he can ask the person where they're going and what they're up to. You know, there's no prohibition on that kind of thing. They're not in custody. But you have to have some basis to ask a citizen, minding his or her own business, where they're going. And that's exactly the point here. The sorts of factors that might have justified— A question is asked. Can't a response be, I don't see that as part of your business. It could be that. But I imagine Officer Morea would say that was a sign of nervousness, that he refused to answer those questions. That's 22. So I see that I am out of time, unless Your Honors have further questions about this issue or any others. I'll reserve the rest for rebuttal. Thank you. And you have reserved one minute for— We'll hear from the government. Good morning, Your Honor. Your Honors, my name is Christy Greenberg. I'm an assistant U.S. attorney with the U.S. Attorney's Office in the Southern District of New York, representing the government in this appeal. So I'd like to start with Rodriguez, first in distinguishing Rodriguez from this case, and then also addressing what I believe is a misreading of Rodriguez. First, in Rodriguez, the traffic stop was over. All of the relevant information pertaining to the stop had been obtained by the officer, and the officer had issued the ticket. At that point, the officer could not extend the traffic stop. Okay, but this officer did not issue the ticket, even though he had all the information he needed to issue the ticket. So are we going to give him the benefit of extending the stop by not issuing the ticket? Right. To get around Rodriguez? Well, so Rodriguez doesn't hold that— It says when the mission is complete. It says when—it doesn't say that—it says all the tasks associated with issuing the traffic violations either were complete or reasonably should have been complete. There's some wiggle room there in terms of what is reasonable, and— So what was left to do at the time he asked Mr. Rodriguez, I believe, to get out of the car? So the facts that were before the officer at this eight-minute mark are that you have a driver of a car who's been asked, where are you coming from, and he doesn't know the answer. He hesitates. He's nervous. He's shaking. He turns to the passenger, and, you know, there's a moment where he's looking to him for the answer and then says the passenger's aunt's call— And he says, we're coming for my aunt. My aunt, not your aunt. You don't necessarily have to know, but we're coming from my aunt's house. The pass—the driver said from the passenger's aunt's house. When asked for a location of where that was, he could not answer. He could not provide any location of where he— You know, if this were a ground for arrest, how many people who don't pay attention to addresses, especially—weren't they coming from an area with lots of apartment houses? We're not talking about arrest here, are we? No. No, we're not. We're just—this is just for the purposes of a traffic stop and being pulled over for a traffic stop. Asking the driver where you were coming from seems like a fairly basic question that a driver should be able to answer. We're not saying he had to have the address of the house, and, of course, we know they weren't at the passenger's aunt's house. He said they came from his aunt's house. Did he have to know the street address, an apartment number? No. The driver simply needed to provide a location. The reason he couldn't do it is because that's not where they were. They weren't in New Jersey. They weren't at the passenger's aunt's house. They were at an apartment building in Washington Heights buying drugs, and they were coming back from doing that. And Hutchinson Parkway is, and there is testimony in the record, a drug corridor. So—but these are—given those facts, given the fact that the officer had asked a basic question, and it's implausible for the driver to have no response at all and to be that nervous about a very basic and simple question, to be shaking as he provide—his hands are shaking as he's providing his documents. You know, they're speaking in low voices. They're not making eye contact. All of those things taken together certainly allow the officer to ask some questions, putting aside the fact that that would be reasonable suspicion, also just for traffic, for safety purposes. To inquire further is entirely reasonable in these circumstances. But safety purposes were vindicated by having him get out of the car. Well, certainly if someone is nervous, they don't know where they're going or where they're coming from, maybe you want to ask some more questions before you let that person get out on the road. He had no reason to believe that he was impaired in any way, did he? No. Well, I think he had a reason to think there was something wrong. He didn't think he was impaired by drugs or alcohol, did he? At that stage, no. His hands are shaking, and he's very nervous, and he can't answer basic questions. I don't think the officer had formed an opinion—it's not in the record—one way or another whether he believed at that point he was impaired. He certainly believed as an officer that he wanted to inquire more, and that's entirely reasonable for him to have done. And again, Rodriguez does not prohibit the officer from asking a basic question like that at a traffic stop. That's fairly routine. In fact, in Rodriguez, the officer asked, where are you coming from? Where are you going? After he went and did a check, he came back and asked, where are you coming? Where are you going? He went and did a check, found the license plates, found the driver's licenses, and the car was registered, no question there, once he did his computer check. It really scares me to think, in this country, that you can get arrested because you're nervous. Who isn't arrested when they're stopped by the police? Well, and to be clear, at this point, the officer was not seeking to arrest him. All we're talking about now is— I believe he arrested him once, but when he took him out of the car, that was the beginning of an arrest. Well, at this stage, this eight-minute stage, nobody's taken out of the car. He simply asked— But after eight minutes, you take him out of the car, right? After eight minutes, the officer asks Rivera-Vasquez, the driver, to get out of the car. And for what reason? He wanted to— Did he have reasonable suspicion at that point of it? Yes. To be very clear, our position is, at that eight-minute mark, even if you agree that somehow it was required, he had to write that ticket at that eight-minute mark, which we do not believe Rodriguez says you had to do, that there is reason— You have to complete the mission that you started. What you have to do is complete the mission, but it's within reason. And from what does reasonable suspicion arise? Reasonable suspicion here arises from the totality of inability to answer questions, the fact that it's implausible not to have a very basic response of where you're coming from, and even the passenger whose aunt it was couldn't provide any sort of articulable specific answer. Excuse me. He said they're coming from his aunt's house when he turned to Santillan, I believe, and said, where are we coming from? And he said, your aunt's house. Correct. And then the officer further inquired for a location, and he could not answer. Because it wasn't his aunt. But he was the driver. So just basically knowing where you were coming from and where you were going is a general matter. I understand, but if he said the Bronx, would that have been enough? It would have been a location. It would have been some more information than not having an answer and appearing very nervous. I don't know that they have the right to this information. That's my question. I mean, they were nervous. Do you want to arrest these guys because they were nervous? Well, again, at this stage, we are just talking about reasonable suspicion of wrongdoing. Right. Tell me what had arised. Tell me when what you call reasonable suspicion arose in this case. So our position is, at this eight-minute mark, given the fact that there is an inability to provide any real specificity to basic questions about origin and destination, coupled with the nervousness, coupled with the fact that the passenger did have a photocopy of an identification. But it was not a forgery. They checked it in the computer. That's correct. And so he had a photocopy, but it was a real license. And it had his real picture on it, didn't it? That is correct. Photocopy. So these are the two things, nervousness and a photocopy of a real document. That seems skimpy, doesn't it? And, again, the answers to the questions, which, again, simply provide some reasonable suspicion that something is wrong. There are cases where you're finding implausible or inconsistent answers coupled with nervousness does support reasonable suspicion. When you said before that he was coming from a drug house, that is all post-eight minutes. You didn't have that information when you asked him that. Isn't that correct? That is correct. At that point, they didn't know he was coming from a drug house. And we're not going to examine anything that happened after the eight minutes in order to bolster that case. Isn't that correct? Well, again, I think you could continue to look at it, because I think the traffic stop was permitted to continue, whether it's because the traffic stop alone allowed you to continue. The traffic stop allowed you to continue until you completed the mission of the traffic stop. That's what Rodriguez says. And the mission was to write the ticket and leave these people alone. Well, again, I think there's a part. Rodriguez, again, doesn't require the instant that you have all the information. You must write the ticket. It just says you have to be reasonably completing it. I think it sort of does say that. And it deals with the wrong of stopping someone and keeping them until you find something to charge them with. That's what Rodriguez was designed to counteract. Can I ask one question? Did the traffic stop become a Terry stop before it became an arrest? And when did that happen? Yes, Your Honor. So at the point at which the two occupants of the car get out of the car, they're asked questions. And at the point where they're being then placed in patrol cars, at that point, there is a Terry stop. It's an investigative detention at that point. Your Honor, I see I have very little time left. So I just want to shift to one other issue. With respect to the cash in the back pocket of Santeon, I'd like to just note that there essentially was the officer asking, initially, Hector Santeon how much cash he had on him. He said $80. The officer later, when he frisked him, found in the back pocket, there was $1,000, pulled it out of his pocket, and then asked Santeon what that was. Santeon responded that it was $1,000. The only basis for a frisk, as I read Second Circuit law, is to protect the safety of the officers. He never thought it was a weapon. Isn't that correct? Well, he had various reasons to be concerned for his safety. One, it's of course not— He never thought it was a weapon, the bulge of cash. No, no, he didn't. And so, Judge—and when the motion to suppress on this point came up, Judge Sweet found that ultimately, when he was arrested, it would have been inevitably discovered. For the cash. For the cash. That leaves open the question of if it was an unlawful pat-down at that point, and then later on it would have been eventually discovered, the cash comes in. But the statements don't. Well, so I want to get to the statements. So the statements with respect to not the $80 that happened before the frisk, but after the frisk, where he pulls out the cash and Santeon says, yeah, I thought you were asking about my front pocket, it's $1,000. Those statements, there was—at the district court level, there was never a motion to suppress on Fourth Amendment grounds. The first time we are seeing this argument, that those statements are the fruits of an illegal search and seizure, is on appeal. So that argument has been waived. On what basis did they seek to suppress? They sought to suppress on Fifth Amendment grounds, essentially saying that all of those pre-arrest statements were taken in violation of Miranda and in violation of the Fifth Amendment. And in fact, if the wad of cash would have been discovered later, if the frisk was illegal, it would never have been discovered. I don't know the basis for any frisk at that point. The basis for the frisk at this point is officer safety— He said that, didn't he? Well, he sees a bulge. He doesn't know at that point what it is. He has suspicion at that point. At the point he takes Santeon out of the car, he's able to see in the car, he sees the cell phone, multiple cell phones, energy drinks. He sees— All of this is after the eight-minute mark when he could have written the ticket and let these guys continue on their journey. Isn't that true? That is correct. All right. Thank you. Thank you. You have one minute in rebuttal, Ms. Barth. The pat-down search was not supported by reasonable suspicion, and it further supports the argument that Officer Morea was just on a fishing expedition. Wait a minute. Wait a minute. The pat-down search was— When was the pat-down search in relation to the overall stop? It was after Mr. Santeon was pulled out of the car, and it was after the eight-minute mark. Right. So at that point, there were other things that happened, right? They found the— They noticed that there was a difference in the height of the seats during that period of time. Right. But that was after the Fourth Amendment terminus that we talked about earlier. That was after the commission of ticketing— No, no, no, no, no. But before the pat-down search. The pat-down search was purportedly to search for— I know that. But please, you're not going on basis of the information that was obtained in the first eight minutes. That was not the only information they had at the time of the pat-down search. That's correct. They had further information after they got out of the car that supported reasonable suspicion. That's correct, Your Honor. Okay. Including the fact that there was a difference in the height of the seats, which any reasonable officer and these reasonable officers knew could indicate a trap in the car for narcotics. That's what they reacted to. That's an inference that's supported by the record. Okay. Let me just state again that that comes after the eight-minute mark when the ticket could have been written. That's right. And at the time that Officer Marea reached into the pockets and pulled out that wad of cash, he knew that it wasn't a weapon. And an objectively reasonable officer would have known it wasn't a weapon. It was a fishing expedition. Then Officer Marea took that cash and confronted Mr. Santillan with it, resulting in statements. If the statements were admitted, how do they, at that point, affect, and if it was illegal to do so, why isn't that harmless error? It's not harmless because the government used Santillan's dishonest statements about the cash as its proof positive that he knew about the cocaine. It argued that point at least five times during its closing arguments. That's at JA 388 to 89, JA 993, 994, 1056, and 1057. And just to quote one of those passages, and they all have the same flavor, but it's not just that he had $1,000, ladies and gentlemen. It's not that at all. It's that he lied about it. Okay. What did he say? What did he say? He said the reason. Then he gets caught and admits he had $1,000. And you heard from Officer Marea when he admits it. He smirks. He gets a little cocky. But at that point, Junior Rivera Vazquez was a cooperating witness who had described how they picked up the drugs, moved the drugs, and all of the circumstances of the trafficking, drug trafficking. And in addition to the fact where the drugs were stored, had been located, and so forth. There's a fair amount of evidence against your client. All of that evidence came from a cooperating witness whose testimony is going to be evaluated more critically than any other witness during trial. So I think the government thought it was important to its case, and it used it. Well, it's entitled to whatever more evidence they can get. If it was improper here, then we have to see whether the other evidence, the fact that Mr. Santillan was sitting on the trap and there was various evidence to corroborate Vazquez's statements, was evidence that would have led to a guilty verdict in any event. So that's for us to judge. You have your argument. And the point is that the government's repeated use of those statements at trial and using those dishonest statements about the cash as its proof positive, I think points to how harmful that error really was. Okay. Thank you. Thank you both for a lively argument.